*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2017 UT 17**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

WILLIAM COMPTON, JOHN SIMCOX, and SALTAIR INVESTMENTS, LLC,
*Appellants,*

*v.*

HOUSTON CASUALTY COMPANY,
*Appellee.*

No. 20150837
Filed March 23, 2017

On Direct Appeal

Third District, Salt Lake
The Honorable Paul G. Maughan
No. 130906137

Attorneys:

Thor B. Roundy, Cory B. Mattson, Bountiful, for appellants

Rebecca L. Hill, Salt Lake City, Karl A. Bekeny, Paul L. Janowicz,
pro hac vice, Ohio, for appellee

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE LEE, JUSTICE DURHAM, JUSTICE HIMONAS, and
JUSTICE PEARCE joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶ 1   This case requires us to determine the scope of the "covered profession" clause of a "Professional Liability Errors & Omissions Insurance" policy (Policy). Houston Casualty Company (Houston Casualty) issued the Policy to Utah County Real Estate, LLC (Prudential), a real estate brokerage. While working as a real estate agent for Prudential, Robert Seegmiller approached the plaintiffs in this action, William Compton, John Simcox, and their company, Saltair Investments, LLC (collectively, Investors), with information

about a potential real estate transaction in Herriman, Utah. The Investors and seller Valley View Estates, LLC (Valley View) signed a Real Estate Purchase Contract (REPC), drafted by Mr. Seegmiller, which provided that the Investors were to deposit $705,000 into escrow as a "reservation deposit." Valley View was to develop the tract of land into individual lots, after which the Investors would pay the final contract price. Mr. Seegmiller did not tell the Investors that he was to receive money from Valley View in exchange for bringing a buyer to the transaction. Further, the REPC did not provide that any portion of the funds to be transferred at closing would go to Prudential.

¶ 2 Though the Investors deposited the $705,000 into escrow, Valley View failed to develop the lots as promised. When the Investors attempted to obtain their money back from escrow, they discovered that Valley View had withdrawn the deposit and used it for various purposes, including paying Mr. Seegmiller $165,000. No portion of the $165,000 ever passed through Prudential. In an earlier lawsuit that serves as a predicate to the current case, the Investors obtained a judgment against Mr. Seegmiller for "negligence" in the amount of $1,041,275.34. The court's order stated that Mr. Seegmiller was liable for "failing to clarify his role in the transaction, and failing to disclose a personal interest in the transaction."

¶ 3 Rather than execute the judgment against Mr. Seegmiller, the Investors settled with him, acquiring any claims he might have against Prudential's insurer, Houston Casualty. The Investors then brought the current action as a new lawsuit alleging that Houston Casualty breached the Policy by failing to defend and indemnify Mr. Seegmiller. The Policy covers losses that arise when an insured acts "[s]olely in the performance of services as a Real Estate Agent/Broker of non-owned properties, for others for a fee." The district court in this case granted summary judgment for Houston Casualty on the ground that, because Mr. Seegmiller had a "personal interest" in the transaction, he held "dual or competing roles" that precluded the possibility that he could have "acted 'solely' as Plaintiffs' real estate agent 'on behalf of' Prudential."

¶ 4 The Investors appeal the district court's grant of summary judgment, arguing that it misconstrued the scope of coverage under the Policy and contending that the plain language of the Policy mandates coverage for the judgment rendered against

Mr. Seegmiller in the earlier lawsuit.[1] Houston Casualty counters that the district court's interpretation of the Policy was proper, and it also urges that we affirm the grant of summary judgment on several alternative grounds. These grounds are, first, that Mr. Seegmiller was not acting "on behalf of" Prudential in the transaction; second, that he was not providing services "for a fee" in that transaction; third, that his conduct falls within the Policy's "dishonest acts" exclusion; and fourth, that coverage is barred on grounds of waiver or estoppel.

¶ 5    We affirm the district court on the alternative ground that Mr. Seegmiller was not providing services "for a fee" in the transaction.[2] We reach this conclusion because the circumstances surrounding the formation of the insurance contract indicate that Prudential's agents are compensated through only one mechanism: a traditional real estate commission. The Investors' attempts to expand the concept of "commission" to cover the events at issue here are unavailing. We construe the phrase "for a fee" to mean that the real estate agent must have been providing services with the expectation of receiving a traditional real estate commission. The record contains no evidence that Mr. Seegmiller had such an expectation, so we conclude he was not providing services "for a fee."

---

[1] The Investors also assert that Houston Casualty breached its duty to defend Mr. Seegmiller. We conclude that this issue was inadequately briefed in the Investors' opening brief and therefore decline to reach it. *See* UTAH R. APP. P. 24(a)(9) (the appellant's brief "shall contain the contentions and reasons of the appellant with respect to the issues presented . . . with citations to the authorities, statutes, and parts of the record relied on"); *State v. Wager*, 2016 UT App 97, ¶ 19, 372 P.3d 91 ("An issue is inadequately briefed when the overall analysis of the issue is so lacking as to shift the burden of research and argument to the reviewing court."(citation omitted)). The Investors' brief makes only conclusory assertions that the duty to defend was breached, and it provides no analysis.

[2] Because we conclude that Mr. Seegmiller's conduct in the transaction was not covered by the Policy as a matter of law in that he was not providing services "for a fee," we do not reach any of the other issues.

## Background

¶ 6   Prudential is a real estate brokerage that affiliates with real estate agents who represent buyers and sellers in real estate transactions. To insure against potential liability for the acts of its agents, Prudential purchased the Policy from Houston Casualty. The Policy covers losses that arise from the wrongful acts of Prudential agents acting in the "profession described in Item 3 of the Declarations." Item 3 of the Declarations defines the "Named Insured's Profession" by a reference to "Endorsement #1," which in turn defines the "Named Insured's Profession" as "[s]olely in the performance of services as a Real Estate Agent/Broker of non-owned properties, for others for a fee."

¶ 7 Prudential uses employment contracts to establish the nature of its rights and responsibilities with respect to its sales agents, including describing the nature of its agents' compensation. Robert Seegmiller had a "Broker-Sales Associate Agreement" with Prudential (Employment Contract)  providing that "[c]ompliance with state laws, rules and regulations require that commissions, finder fees, bonuses or referral fees be paid to the Broker rather than to the Salesperson directly." Prudential also promulgated an internal "Policy and Procedure Manual," in effect at the time the parties negotiated the Policy, which provides "PAYMENT OF COMMISSIONS BY ASSOCIATES. Real Estate regulations prohibit the payment of commissions between sales associates. All commissions or referral fees must be handled through the broker."

¶ 8 While employed as a real estate agent for Prudential, Mr. Seegmiller introduced the Investors to two real estate transactions, referred to as the Highland transaction and the Herriman transaction. The Highland transaction is not directly at issue on this appeal. In the Herriman transaction, Mr. Seegmiller introduced the Investors to Valley View, a company that planned to develop a large tract of property in Herriman, Utah, into individual lots and then sell them as a group. The Investors and Valley View, through its principal, Sterling Barnes, entered into a REPC, drafted at least in part by Mr. Seegmiller, which provided that the Investors would deposit $705,000 into escrow as a "reservation deposit," after which Valley View would develop the individual lots and record the plat. Upon recordation of the plat, the deposit would become non-refundable and the Investors were to pay the balance of the purchase price. No provision in the REPC provides that any funds are to be paid to Prudential, and Prudential's name does not appear on the REPC. As provided in the REPC, the Investors deposited $705,000 into escrow. But Valley View breached the agreement by failing to

develop the lots, and the plat was thus never recorded. In response, the Investors sought return of their escrow deposit. They then learned that Valley View had removed the escrow funds and used them for various purposes, including paying $165,000 to Mr. Seegmiller for his role in bringing the Investors to the transaction.

¶ 9 The Investors pursued two separate lawsuits in their attempt to recover their lost escrow deposit, the first against Mr. Seegmiller and others, the second against Prudential's insurer, Houston Casualty. In the first lawsuit—which is not directly before us on this appeal—they sued Mr. Seegmiller and a number of other defendants, including Prudential, Valley View, and Mr. Barnes for their actions in connection with the Herriman transaction. The Investors asserted claims against Mr. Seegmiller for accounting, breach of fiduciary duty, negligence, fraud, negligent misrepresentation, and conspiracy. The Investors asserted claims against Mr. Barnes and Valley View for accounting, theft, fraud, and conspiracy.

¶ 10 In the earlier lawsuit, against Mr. Seegmiller and codefendants, the Investors moved for summary judgment on each of their claims. The district court in that case denied summary judgment on the breach of fiduciary duty claim because it concluded that a genuine dispute of fact precluded a finding that Mr. Seegmiller acted as the Investors' real estate agent. But the court granted summary judgment on the Investors' negligence claim, concluding that "[e]ven if a real estate agent is not acting in the capacity of agent for another party, he still owes certain duties to all parties to any transaction in which he is involved." The court reasoned that, "regardless of whether Mr. Seegmiller was acting as the real estate agent for [Investors] for the purpose of purchasing the Herriman lots, he owed certain duties to the [Investors], which he breached by failing to clarify his role in the transaction, and failing to disclose a personal interest in the transaction." Because the court concluded that Mr. Seegmiller was liable for negligence as a matter of law, it entered judgment against him for $1,041,275.34. This amount represented the Investors' $705,000 of earnest money plus interest.

¶ 11 With this judgment in hand, the Investors chose to settle with Mr. Seegmiller rather than enforce the judgment against him. As part of that settlement, they obtained any claims Mr. Seegmiller might have against Houston Casualty. The Investors then filed a second lawsuit—the one currently before us on this appeal—claiming that Houston Casualty breached the Policy by refusing to

defend and indemnify Mr. Seegmiller for his conduct in the Herriman transaction.

¶ 12 In this case, the parties cross-moved for summary judgment on the issue of whether the Policy covers the judgment against Mr. Seegmiller for his conduct in the Herriman transaction. The district court granted Houston Casualty's motion and denied the Investors', concluding that "[b]ecause [Mr.] Seegmiller had a personal interest, he held dual or competing roles in the transaction," which prevented him from acting "'solely' as [Investors'] real estate agent 'on behalf of' Prudential." The district court therefore concluded that, as a matter of law, the Policy does not cover Mr. Seegmiller's conduct in the Herriman transaction. The Investors now appeal that determination. We have jurisdiction under Utah Code section 78A-3-102(3)(j).

## Standard of Review

¶ 13 "An appellate court reviews a [district] court's legal conclusions and ultimate grant or denial of summary judgment for correctness and views the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party."[3] "We may affirm a district court's entry of summary judgment if it is sustainable on any legal ground or theory apparent on the record."[4]

## Analysis

¶ 14 We must determine whether Prudential's Policy covers the judgment rendered against Mr. Seegmiller in the earlier lawsuit for his undisclosed receipt of $165,000 in the Herriman transaction. Under the Policy's coverage clause, if Mr. Seegmiller was acting "[s]olely in the performance of services as a Real Estate Agent/Broker of non-owned properties, for others for a fee" when he failed to disclose his personal financial stake in that transaction, then the loss is covered and Houston Casualty must satisfy the Investors' judgment. But if Mr. Seegmiller was not providing services "for a fee," then the Policy does not cover his conduct and Houston Casualty is entitled to summary judgment. We conclude that Houston Casualty is entitled to summary judgment because Mr.

---

[3] *Utah Transit Auth. v. Greyhound Lines, Inc.*, 2015 UT 53, ¶ 15, 355 P.3d 947 (alteration in original) (citation omitted).

[4] *Commercial Real Estate Inv., L.C. v. Comcast of Utah II, Inc.*, 2012 UT 49, ¶ 14, 285 P.3d 1193 (citation omitted).

Seegmiller did not provide services "for a fee" in the Herriman transaction. We affirm the district court on this alternative ground.

¶ 15 We first conclude that the phrase "for a fee" has only one reasonable interpretation given the circumstances. In light of the language of the Policy, the nature of Prudential's business, and the legal and factual landscape that confronted the parties to the insurance contract, the only reasonable construction is that "for a fee" means "with the expectation of receiving a traditional real estate commission."

¶ 16 After determining that the phrase "for a fee" defines coverage to exist only where an agent is acting with the expectation that he will receive a traditional real estate commission in exchange for his services, we then assess whether there is a genuine factual dispute as to whether Mr. Seegmiller had such an expectation in the Herriman transaction. We conclude there is no evidence in the record that would allow us to draw a reasonable inference that he had such an expectation. To the contrary, the record before us contains only evidence of the opposite conclusion, that Mr. Seegmiller understood this transaction to involve "no commissionable event." We therefore affirm the grant of summary judgment on the alternative ground that Mr. Seegmiller was not providing services "for a fee" in the Herriman transaction.

I. We Affirm the Grant of Summary Judgment on the Alternative Ground that Mr. Seegmiller Did Not Provide Services "For a Fee"

*A. "For a Fee" Means "With the Expectation of Receiving a Traditional Real Estate Commission"*

¶ 17 We first assess the meaning of "for a fee" in the Policy. "Insurance policies are contracts between the insurer and the insured and must be analyzed according to principles of contract interpretation under Utah law."[5] Our first step is to "look to the contract and construe its terms to give effect to the intentions of the parties."[6] The best indication of the parties' intent is the language they chose to use in the contract, so the parties' intent "should be gleaned from an examination of the text of the contract itself."[7] "We

---

[5] *Ohio Cas. Ins. Co. v. Unigard Ins. Co.*, 2012 UT 1, ¶ 16, 268 P.3d 180.

[6] *Doctors' Co. v. Drezga*, 2009 UT 60, ¶ 12, 218 P.3d 598.

[7] *Id.* (citation omitted).

construe insurance contracts by considering their meaning 'to a person of ordinary intelligence and understanding, viewing the matter fairly and reasonably, in accordance with the usual and natural meaning of the words, and in the light of existing circumstances, including the purpose of the policy.'"[8] "[I]f the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language."[9]

¶ 18 If, on the other hand, we determine there is an ambiguity in the insurance policy, we resolve "any ambiguity or uncertainty in the language of an insurance policy . . . in favor of coverage."[10] An ambiguity exists when a provision "is capable of more than one *reasonable* interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies."[11]

¶ 19 In conducting this analysis, the relevant parties are those that negotiated and entered into the insurance contract: Prudential and Houston Casualty. The coverage clause of the Policy provides that Houston Casualty shall pay for losses that are incurred when an insured "acting in the profession described in Item 3 of the Declarations" commits a "Wrongful Act." Item 3 of the Declarations defines the "Named Insured's Profession" by a reference to Endorsement #1. That Endorsement in turn defines the "Named Insured's Profession" as "[s]olely in the performance of services as a Real Estate Agent/Broker of non-owned properties, for others for a fee."

¶ 20 The Investors' first argument is that we need not consider the meaning of "for a fee" at all, because in their view the coverage clause is not limited by the description of the "Named Insured's Profession" that appears in Endorsement #1. They view Endorsement #1 as simply identifying one profession—real estate agent/broker—to the exclusion of other professions. We disagree. To

---

[8] *Id.* (citation omitted).

[9] *Ohio Cas. Ins. Co.*, 2012 UT 1, ¶ 16 (alteration in original) (citation omitted); *see also id.* ("We 'afford[] the policy terms their usually accepted meanings and giv[e] effect to and harmoniz[e] to the extent possible all policy provisions.'" (alterations in original) (citation omitted)).

[10] *Doctors' Co.*, 2009 UT 60, ¶ 12 (citation omitted).

[11] *Id.* (citation omitted) (emphasis added).

adopt this interpretation would be to essentially rewrite the "Named Insured's Profession" to "real estate agent/broker" with no further limitation. Such a result would conflict with Prudential and Houston Casualty's deliberate choice to incorporate by reference the more restrictive definition found in Endorsement #1. We can see no reason for including this limiting language other than to delineate the scope of coverage. The coverage clause, by its incorporation by reference of the definition in Endorsement #1, thus means coverage is available only when the insured is acting "[s]olely in the performance of services as a Real Estate Agent/Broker of non-owned properties, for others for a fee."

¶ 21 Having concluded that "for a fee" delineates the scope of coverage, we next consider the parties' competing interpretations of the phrase "for a fee." Houston Casualty argues that an agent is providing services "for a fee" only when the agent is providing services with the expectation that he or she will obtain a traditional real estate commission, to be paid out of funds at closing, where the funds are first paid to the agent's broker as required by Utah law. On the other hand, the Investors argue that the phrase "for a fee" is not limited to a "traditional real estate commission." In their view, the phrase "for a fee" is broad enough to include the payment of $165,000 from the sellers of the Herriman property directly to Mr. Seegmiller, even though these funds were taken from an escrow "reservation deposit," not a closing, and no portion of the funds passed through Prudential. Essentially, they view "for a fee" as meaning simply "for the payment of money."

¶ 22 The question we must address is whether both of these readings are reasonable. If so, the clause is ambiguous, and we would construe that ambiguity in favor of coverage.[12] In making the determination as to whether an ambiguity exists—that is, whether both of these proposed readings of "for a fee" are reasonable—we look to the language of the contract as well as the circumstances surrounding its formation.[13] Even if both readings might appear in

---

[12] *Doctors' Co.*, 2009 UT 60, ¶ 12 ("[A]ny ambiguity or uncertainty in the language of an insurance policy must be resolved in favor of coverage," which is justified by "the need to afford the insured the protection he or she endeavored to secure by paying premiums." (citation omitted)).

[13] *Watkins v. Henry Day Ford*, 2013 UT 31, ¶ 26, 304 P.3d 841 ("'When determining whether a contract is ambiguous, any relevant
(Continued)

isolation to be permissible constructions, if "all but one of the meanings" is rendered unreasonable "by context," [14] the provision is unambiguous.

¶ 23 We conclude, in light of the existing circumstances and the purpose for which Prudential purchased the Policy, that it is unreasonable to read the words "for a fee" so broadly as to include payment made directly to a real estate agent from a source other than the brokerage. Instead, we conclude that Houston Casualty's reading—that the term is limited to traditional real estate commissions to be paid to the agent from the brokerage out of funds transferred at the closing of a real property transaction—is the only reasonable one in these circumstances. We reach this conclusion for several reasons.

¶ 24 First, Utah law requires that any money paid to a real estate agent first be funneled through a real estate broker. [15] We find it unlikely that the parties intended the word "fee" to stretch so broadly as to include the payment of money in violation of law. The more logical assumption is that in using the phrase "for a fee," the parties contemplated lawful conduct. [16]

---

evidence must be considered' and 'the better-reasoned approach is to consider the writing in light of the surrounding circumstances.'" (citation omitted)).

[14] *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 13, 248 P.3d 465 (noting, in the statutory construction context, that simply because language "may be susceptible of multiple meanings does not render it ambiguous; 'all but one of the meanings is ordinarily eliminated by context.'" (citation omitted)).

[15] The statute applicable at the time of contract formation was Utah Code section 61-2-10 (2006), which provided that "[i]t is unlawful for any associate broker or sales agent to accept valuable consideration for the performance of any of the acts specified in this chapter from any person except the principal broker with whom he is affiliated and licensed." This section was renumbered in 2010 but contains substantively the same restriction. *See* UTAH CODE § 61-2f-305(1) (2016) ("[A]n associate broker or sales agent may not accept valuable consideration for the performance of an act specified in this chapter from a person except the principal broker with whom the associate broker or sales agent is affiliated.").

[16] Certainly the parties to the Policy contemplated that Prudential's agents might engage in *some* unlawful conduct; to be

(Continued)

¶ 25 Second, the parties agree that Prudential agents are paid one way: by commission.[17] Prudential's internal policy documentation and Mr. Seegmiller's Employment Contract with Prudential reinforce this conclusion. These documents indicate that the only "fees" that Prudential's agents receive are commissions, that is to say, funds that Prudential distributes to the agent out of funds paid at the closing of a real estate transaction. The Employment Contract indicates this where it provides that "[c]ompliance with state laws, rules and regulations require that commissions, finder fees, bonuses or referral fees be paid to the Broker rather than to [the] Salesperson directly."[18] Prudential's internal "Policy and Procedure Manual" also

---

sure, the very purpose of errors and omissions liability coverage is to insure against the "Wrongful Act[s]" of Prudential real estate agents, which the Policy defines as "any actual or alleged error or omission or breach of duty committed or alleged to have been committed" while acting in the covered profession. But the Policy does not insure against *all* wrongful acts; it insures against only those acts committed while acting in the covered profession, which is defined as requiring, among other things, that the real estate agent was providing services "for a fee." Thus the question here is what the parties intended by the words "for a fee" in choosing to employ that language as a limitation on the scope of coverage. In making this determination, we are guided by the fact that a state statute existing at the time of contract formation and still in force today requires commissions to be paid first to the principal real estate broker, who then has the exclusive ability to lawfully provide compensation to the agent. In determining the meaning of the limitation "for a fee" in the definition of the covered profession, the fact that the law requires all fees first go to the principal broker, and therefore flow through the brokerage, informs our understanding of the scope of risk the parties intended to cover. *See* Utah Code § 61-2f-305(1) (2016); *id.* § 61-2-10 (2006).

[17] In the underlying motion for summary judgment, Houston Casualty included the following statement of undisputed fact:

At all relevant times, Prudential paid its real estate
agents exclusively by commission.
RESPONSE: Undisputed.

[18] The only indication that there may be some exception to the general rule at Prudential that sales agents are compensated only by traditional real estate commissions is the next line of the Employment Contract, which provides "Salesperson may not enter

(Continued)

indicates this where it provides the following: "PAYMENT OF COMMISSIONS BY ASSOCIATES. Real Estate regulations prohibit the payment of commissions between sales associates. All commissions or referral fees must be handled through the broker."

¶ 26 The Investors offer no evidence that Prudential's agents are paid in any way other than by traditional real estate commission. Our review of the record confirms this exclusive payment mechanism. We find no support for the notion that, where no portion of the funds was to flow through the brokerage at closing,[19] such a payment could ever be considered a customary real estate commission and therefore a "fee" under the Policy. To the contrary, the record indicates that commissions flowed in a very specific fashion through this real estate brokerage. We cannot conclude, on the basis of this record, that Prudential and Houston Casualty would have intended "for a fee" to include payment from sources other than the brokerage or to include payments not transferred at closing.

---

into an agreement with a client for payment of compensation of any kind in lieu of the customary commission without the written consent of Broker." At most, this provision could expand the meaning of "for a fee" to include those circumstances where the broker provides "written consent" for a real estate agent to "enter into an agreement with a client" for some compensation other than an ordinary commission. But we need not consider whether this is the case because there is no indication that any such thing happened here. There was no agreement for payment from a "client." It is undisputed that the only payment here came from the seller, Valley View, an entity that was not Mr. Seegmiller's real estate client, but was represented by its own agent, Jeff Faves, in the transaction. Additionally, there is no indication in the record that Mr. Seegmiller obtained the written consent of Prudential to be paid directly. But in any event, this clause actually reinforces our conclusion that the general rule at Prudential, consistent with Utah law, is that all commissions must flow through the broker.

[19] The Employment Contract provides that "No commission is considered earned . . . until a transaction closes." Thus, before Prudential ever incurs an obligation to transfer funds to an agent under its employment contracts, the transaction must have been consummated in a closing. This contractual order of operations, that commissions become due only after closing, is further indication that the parties intended "for a fee" to encompass only traditional real estate commissions that involve the transfer of funds at closing.

¶ 27 In sum, all of these circumstances convince us that the interpretation advanced by the Investors is unreasonable. The phrase "for a fee" cannot reasonably be read to include services performed with no expectation of receiving money that flows from the brokerage at closing. Rather, the only reasonable reading is that the parties to this insurance contract intended to include within the covered scope of risks only those transactions where the agent was providing services with the expectation of receiving a traditional commission, to be paid first to the brokerage and then distributed to the agent out of funds transferred at closing.[20]

*B. The Record Does Not Support a Reasonable Inference that Mr. Seegmiller Provided Services with the Expectation of Receiving a Traditional Real Estate Commission*

¶ 28 Because we conclude that "for a fee" means "with the expectation of receiving a traditional real estate commission," we must address whether there is a genuine dispute of material fact as to whether Mr. Seegmiller had the expectation of receiving such a commission in the Herriman transaction. The record contains no

---

[20] The Investors make one additional argument that Mr. Seegmiller was providing services "for a fee." They contend that, because Mr. Seegmiller was hoping to secure a listing agreement to resell the Herriman properties on behalf of the Investors, he was working "for a fee" during the transaction at issue in this case. We reject this interpretation of "for a fee." Simply because Mr. Seegmiller was working with the hope that he would secure a contract that would entitle to him to commissions from the eventual resale of the property does not mean he was working "for a fee" from the outset. We see no indication in the record that Prudential and Houston Casualty would have intended such an expansive reading. To the contrary, such a construction threatens to eviscerate the "for a fee" limitation. For example, even the clearest example of a transaction that was performed for no fee—a pro bono transaction— would be covered under the Investors' interpretation. This is so because any time a real estate agent elected to provide services to a client for no charge, the agent could also be said to have the hope that such service would lead to future listing agreements. We reject this interpretation because it would render the "for a fee" language essentially a dead letter. We thus conclude that, unless the services are performed with the expectation of a commission *in the instant transaction*, they are not being performed "for a fee."

evidence whatsoever that Mr. Seegmiller expected to be paid a portion of the funds transferred at the closing of the Herriman transaction, or that any such funds were to flow through Prudential before ultimately being transferred to him, as was usual and customary at Prudential. The only evidence in the record on this point is to the contrary. For example, Mr. Seegmiller testified that the Herriman transaction involved "no commissionable event," that is, that Mr. Seegmiller had no expectation that a traditional real estate commission would be paid.[21]

¶ 29 The Investors do not cite to any portion of the record that could support a reasonable inference that Mr. Seegmiller expected to receive a traditional real estate commission for his work in the Herriman transaction. Our review of the record has likewise revealed no indication that Mr. Seegmiller, Mr. Barnes, the Investors, or any other individuals involved with the Herriman transaction ever expected that there would be a commission paid to Prudential out of the funds that would be transferred at the closing of this transaction. The absence of any evidence that could support an inference that Mr. Seegmiller expected to receive a traditional real estate commission is fatal to the Investors' claim that Mr. Seegmiller's conduct in the Herriman transaction was done "for a fee." We therefore conclude that summary judgment was properly granted because there is no genuine dispute of material fact as to whether Mr. Seegmiller was providing services "for a fee." He was not.

**Conclusion**

¶ 30 The Policy provides coverage only when a real estate agent is providing services "for a fee." The record contains no indication that Prudential's agents receive compensation in any form other than a traditional real estate commission. The only reasonable reading of "for a fee" requires that the agent must have an expectation of receiving a traditional real estate commission. The Investors have provided no evidence that Mr. Seegmiller had any expectation that he would be paid a traditional real estate commission for the services

---

[21] The record also contains a transcript of a conversation between Valley View's principal Mr. Barnes and counsel for the Investors that is to the same effect. In that conversation, Mr. Barnes repeatedly emphasized that the Herriman transaction did not involve the payment of any commission.

he provided in the Herriman transaction. We accordingly affirm the grant of summary judgment on the alternative ground that Mr. Seegmiller did not provide services "for a fee."

––––––––––