2024 UT App 95

# THE UTAH COURT OF APPEALS

REGAL REALSOURCE LLC,
Appellant,
*v.*
ENLAW LLC,
Appellee.

Opinion
No. 20230368-CA
Filed July 11, 2024

Fifth District Court, St. George Department
The Honorable Eric A. Ludlow
No. 220500134

Troy L. Booher, LaShel Shaw, Reid W. Lambert, and
Ellen H. Welch, Attorneys for Appellant

Jeremy C. Reutzel and Ryan M. Merriman,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES JOHN D. LUTHY and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1    Enlaw LLC (Enlaw) and Regal RealSource LLC (Regal) entered into a real estate purchase contract (the REPC) in which Enlaw agreed to sell Regal 19.46 acres of undeveloped land (the Property). Some time later, however, Enlaw came to believe that the REPC was unenforceable, and it informed Regal that it would not sell the Property to Regal. In response, Regal filed this lawsuit, seeking specific performance of the REPC, and recorded a lis pendens on the Property.

¶2    The district court eventually entered a series of rulings unfavorable to Regal. Chiefly, the court determined—on summary judgment—that the REPC is unenforceable, and on the

basis of that determination ordered Regal to remove the lis pendens. Regal now appeals those rulings, asserting that the district court erred in determining, as a matter of law, that the REPC is unenforceable, and that it erred in ordering the lis pendens removed. We find merit in some of Regal's arguments, and we therefore reverse some of the court's rulings and remand the case for further proceedings.

BACKGROUND[1]

¶3　Enlaw is a real estate development company that owns approximately 570 acres of land in Washington County, and it is currently in the process of developing this land into a community known as Black Desert. About 300 of these acres—including the Property—are located within the boundaries of Santa Clara, Utah (the City). The Black Desert community is planned to include "a golf course, a luxury hotel, spa, retail, restaurants, outdoor recreational space, and medium density residential units." Part of Enlaw's development plan is to "sell portions of the [land] to other developers," who would then become partners with Enlaw in developing Black Desert.

¶4　Regal is one of these other developers. In 2019, Regal informed Enlaw that it was interested in purchasing a portion of the Black Desert land and that it wanted to build "about 200 single-family homes" that it would "own and rent to the public." It specifically explained to Enlaw that being allowed to build approximately 200 units was essential to its project, even if that might require seeking approval from the City for "an increased density allowance." After negotiation, Regal and Enlaw entered into the REPC in July 2019. Under the terms of the REPC, Regal

---

1. "When evaluating the propriety of summary judgment on cross-motions for summary judgment, we view the facts and any reasonable inferences to be drawn therefrom in the light most favorable to the losing party." *Bloom Master Inc. v. Bloom Master LLC*, 2019 UT App 63, n.1, 442 P.3d 1178 (quotation simplified).

was to purchase "approximately 19.46 acres" of Enlaw's undeveloped Black Desert land—the Property—for $4,378,500.

¶5     But the parties also agreed, in an addendum (Addendum 1) signed the same day as the REPC, that Enlaw—which was otherwise responsible for developing the roads inside Black Desert—would shift the responsibility for development of part of one of the roads to Regal, in exchange for a reduction in the purchase price of the Property. In relevant part, Addendum 1 provides as follows:

> [Regal] will obtain multiple bids for the installation of the road and other improvements including utilities required by local government, utility companies, and other services agencies (Santa Clara City, etc.) to the Property line at the locations and capacities determined by the engineer and the city approved plan. The Purchase Price will be reduced by the cost to complete these improvements. The selection of contractor, the bid amount and the reduction in Purchase Price will be mutually agreed upon by both [Regal] and [Enlaw] prior to the end of the due diligence period. [Regal] will be responsible for these improvements after closing.

¶6     The REPC also contained provisions allowing Regal to undertake "due diligence" regarding the Property. Not only was Enlaw required to make "seller disclosures," but Regal was also given time, at its option and among other things, to obtain surveys and geotechnical reports regarding the Property. The parties also agreed, in Addendum 1, that Enlaw would "assist [Regal] to . . . receive any and all necessary entitlement approvals, including but not limited to a recordable plat and development agreement, for the Property." And they agreed that Regal's due diligence period "shall be extended as needed to obtain these things," but that the period could not "exceed 12 months from the date on which" Enlaw provided its seller disclosures.

¶7 Following execution of the REPC and Addendum 1, Enlaw provided its seller disclosures, completing delivery of those documents by November 2019. And Regal set about attempting to obtain the "necessary entitlement approvals" for the Property, including approval for the 200-unit density it claimed it needed for its project to make financial sense. At the time the REPC was signed, Enlaw did not yet have approval from the City for the overarching Black Desert development. City officials apparently informed Regal that it would not be able to obtain approval for any specific project on the Property until there was an agreement in place governing the larger Black Desert development.

¶8 In September 2020, with the one-year-after-seller-disclosure deadline approaching and Regal still unable to obtain the approvals it needed, the parties decided to extend the deadline for closing their transaction. Specifically, they agreed—in another addendum (Addendum 2)—to "extend the Seller Disclosure Deadline Date to that certain date on which [the City] gives final approval of *Buyer's* development project including, without limitation, an executed development agreement for the Property (the 'Entitlements')." (Emphasis added.) In Addendum 2, the parties defined the term "Buyer" as Regal. And they agreed that the new closing date would be "45 days after the receipt of the Entitlements."

¶9 About a year later, in September 2021, Enlaw finally obtained approval from the City for a master development agreement (the MDA) covering the entire Black Desert development. One provision of the MDA specifically discusses the Property: it states that the Property is "designated for medium density residential" and "can be developed to a density of eight (8) dwelling units per acre, for a total of approximately 133 units." However, the provision also stated that a developer "may seek approval of a density bonus of up to fifty percent . . . for a maximum of approximately two hundred (200) dwelling units," with approval of any such "bonus" being "subject to the conditions set forth in" the City's ordinances.

¶10    Regal learned of the City's approval of the Black Desert MDA in October 2021. At that point, Regal "resubmitted its site plans" for the Property to the City and began the process of asking the City to approve a development on the Property with a higher density. In January 2022, Regal was eventually able to obtain conditional approval for construction of 199 units on the Property. But this "density bonus" was subject to one final condition: the City's approval of a "1-lot subdivision" plat.

¶11    By this time, however, Enlaw had already informed Regal—in November 2021—that it would not sell the Property to Regal. In Enlaw's view, the City's approval of the MDA in September had triggered the 45-day closing deadline set forth in Addendum 2, and Regal had not been in a position to close on the transaction within 45 days of the MDA's approval. As a result, Enlaw told Regal that it considered Regal to be in breach of the REPC's terms, and that it would be "re-listing the Property immediately and seeking other alternatives." In keeping with this position, Enlaw refused to assist Regal in obtaining the City's approval of a 1-lot subdivision plat, and it specifically refused to provide a landowner signature that the City apparently requires as a prerequisite for any such approval.

¶12    In February 2022, Regal initiated the instant lawsuit, suing Enlaw for declaratory relief and specific performance of the REPC. In Regal's view, the start of the 45-day closing period set forth in Addendum 2 was to be triggered not by approval of *Enlaw's* overarching MDA but, instead, by the City's approval of *Regal's* specific development project, an eventuality that, as Regal sees it, has not happened yet. Under this interpretation, Regal is not yet under any obligation to close on the transaction, and it will not be under any such obligation until the City makes a final decision on its density bonus request. Accordingly, in its complaint Regal sought "[d]eclaratory judgment that the REPC remains in full force and effect, and that Enlaw's purported termination of the REPC based on a closing deadline of November 15, 2021, is invalid under the terms of the REPC." Furthermore, Regal alleged that Enlaw had materially breached the REPC and,

because an "award of damages would be an inadequate remedy," Regal asked for "a judgment ordering specific performance" that would require Enlaw to "complete the sale of the Property to Regal on the terms set forth in the REPC and its addenda." The day after it filed its complaint, Regal recorded a notice of lis pendens against the Property.

¶13   Enlaw responded with an answer and counterclaim, seeking declaratory relief and removal of the lis pendens, and seeking damages and attorney fees based on its view that Regal's lis pendens was "groundless." Enlaw further maintained that the REPC was unenforceable, but in the event that the court found it to be an enforceable agreement, it asserted alternative claims against Regal for breach of contract.

¶14   Following the filing of Enlaw's answer and counterclaim, the parties exchanged initial disclosures and some limited written discovery. But before any depositions were taken and well before the expiration of the fact discovery period, Enlaw filed a motion to release the lis pendens, primarily arguing that the lis pendens was improper because it was based on an unenforceable contract. Enlaw also asserted that, even if the REPC were enforceable, Regal's desired remedy—specific performance—was unavailable in any event because the REPC was not sufficiently clear and definite. Regal opposed the release of the lis pendens, and in addition filed a motion seeking partial summary judgment on three discrete points: (1) that the REPC—and particularly its price term, including the price reduction for construction of the road—was sufficiently definite to be specifically enforced; (2) that the term "Entitlements," as used in Addendum 2, referred to final approval of Regal's specific project and not to approval of the overarching Black Desert development; and (3) that "receipt of the Entitlements," as used in Addendum 2, had not yet occurred. Enlaw opposed Regal's motion and filed its own motion for partial summary judgment, seeking an order declaring that the REPC was unenforceable.

¶15 After full briefing on the motions, the district court held oral argument. At the conclusion of the hearing, the court made no ruling but, instead, instructed each side to submit proposed orders that encapsulated the rulings they wished the court to enter. Both sides soon submitted competing proposed orders.

¶16 About a month later, the court signed Enlaw's proposed orders, apparently verbatim, thus granting Enlaw's motion for release of the lis pendens and motion for partial summary judgment, while denying Regal's motion for partial summary judgment. The court agreed with Enlaw that the REPC was "unenforceable because it lack[ed] material terms." In particular, the court determined that the price-reduction provision in Addendum 1 was not sufficiently clear, because it contained "no clear mechanism for determining the price without further bargaining between the parties" and because it did not specify what "other improvements" would need to be included in the road-construction bids. And the court denied Regal's competing motion for partial summary judgment because it determined that there existed unresolved factual issues "regarding the meaning of the term 'Entitlements,'" as used in Addendum 2, and regarding the existence of consideration for Enlaw's agreement, in Addendum 2, to extend the closing period. In its ruling regarding the lis pendens motion, the court also determined that specific performance was unavailable in any event; this determination was based on the court's assessment that the "REPC's price term" is "too vague for specific performance" because it is not "free from doubt, vagueness, or ambiguity." And in that same ruling, the court ruled that Regal had "failed to timely close on the Property" because "the term 'Entitlements'" as used in Addendum 2 referred to Enlaw's MDA rather than to any approval of Regal's specific project.

¶17 Following entry of the court's rulings, Regal asked this court for permission to take an interlocutory appeal from those rulings, and we granted that request.[2]

## ISSUES AND STANDARDS OF REVIEW

¶18 In this appeal, Regal challenges the district court's rulings on the cross-motions for partial summary judgment, as well as the court's order compelling release of the lis pendens. We review the court's summary judgment rulings for correctness. *Shree Ganesh, LLC v. Weston Logan, Inc.*, 2021 UT 21, ¶ 11, 491 P.3d 885. Under this standard, we "give no deference to the district court's legal conclusions and consider whether the court correctly decided that no genuine issue of material fact existed." *Id.* (quotation simplified). Similarly, we review for correctness a district court's "interpretation and application of the lis pendens statutes." *Walker v. Zeus Land Holdings LLC*, 2021 UT App 9, ¶ 13, 482 P.3d 268, *cert. denied*, 496 P.3d 717 (Utah 2021). The district court's rulings also involve its interpretation of the REPC, and "[w]e review a district court's interpretation of a contract for correctness." *Brady v. Park*, 2019 UT 16, ¶ 29, 445 P.3d 395.

## ANALYSIS

¶19 Enlaw's main argument—endorsed by the district court—is that the REPC is "unenforceable because it lacks material terms." But in its briefing on appeal, Enlaw makes a related subsidiary argument, also endorsed by the district court (in its lis pendens ruling): that the REPC, even if otherwise enforceable, "is too vague for specific performance" because it is not "free from doubt, vagueness, or ambiguity." Regal challenges the district court's endorsement of these arguments, as well as the court's order commanding it to release the lis pendens, and we address

---

2. Regal also successfully took steps to obtain a stay of the district court's rulings pending the outcome of this appeal.

the merits of Regal's challenges later in this opinion. But before doing so, we first discuss the legal principles that govern questions related to contractual ambiguity and enforceability, especially as those principles are applied in cases where one party seeks an order of specific performance.

## I. Legal Principles Regarding Contractual Ambiguity, Enforceability, and Specific Performance

### A. Contractual Ambiguity and Enforceability

¶20    The "overriding principle" of contractual interpretation is that "the intentions of the parties are controlling." *Ocean 18 LLC v. Overage Refund Specialists LLC* (*In re Excess Proceeds from Foreclosure of 1107 Snowberry St.*), 2020 UT App 54, ¶ 21, 474 P.3d 481 (quotation simplified). "The best indication of the parties' intent is the language they chose to use in the contract," *Compton v. Houston Cas. Co.*, 2017 UT 17, ¶ 17, 393 P.3d 305, and courts therefore begin their interpretive analysis by looking to the language of the contract, and in doing so they "examine the entire contract and all of its parts in relation to each other," *Ocean 18*, 2020 UT App 54, ¶ 21 (quotation simplified). If the plain language of the contract is clear and unambiguous, then "the contract may be interpreted as a matter of law, without resort to parol evidence." *Id.* ¶ 22 (quotation simplified).

¶21    If, however, the language of the contract is ambiguous, that does not necessarily mean that the contract is unenforceable for vagueness. *See Plateau Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725–26 (Utah 1990) (reversing a district court's ruling that a contract was "ambiguous and therefore unenforceable," and stating that the court "should not have held [the contract] unenforceable because it is ambiguous"); 17 C.J.S. *Contracts* § 60 (2024) (stating that "[t]he use of language, the application of which is uncertain, does not necessarily prevent the existence of a valid contract," and that "[i]f a court is able to ascertain the intent of the parties using the proper rules of construction and principles of equity, then the contract is

sufficiently definite and certain to be enforceable"). In most cases, the presence of ambiguity simply signals that additional litigation and analysis is required; at that point, interpretation of the contract—and ascertaining the parties' intent—becomes a question of fact instead of a question of law. *See Ocean 18*, 2020 UT App 54, ¶¶ 22, 29. A court attempting to interpret an ambiguous contract should admit and examine "parol evidence of the parties' intentions." *Id.* ¶ 29 (quotation simplified); *see also Plateau Mining*, 802 P.2d at 726 (stating that, before declaring the contract unenforceable for alleged vagueness, the district "court should have received evidence to determine the meaning of the terms" of the contract). In some such cases, where the extrinsic evidence "is so one-sided that a reasonable factfinder could reach but one conclusion" about the parties' intentions, interpretation of an ambiguous contract can still occur "as a matter of law at the summary judgment stage." *Ocean 18*, 2020 UT App 54, ¶ 29. But in other cases—where extrinsic evidence points materially in both directions—a question of fact regarding the parties' intent will remain to be decided by the factfinder after trial. *Id.*

¶22 While garden-variety ambiguity regarding the meaning of contractual language will not render a contract so vague as to be unenforceable, exceptional situations do arise in which the contract in question is simply too uncertain to enforce. After all, "a meeting of the minds on the integral features of an agreement is essential to the formation of a contract," and "an agreement cannot be enforced if its terms" remain indefinite even after examination of parol evidence. *See Nielsen v. Gold's Gym*, 2003 UT 37, ¶ 11, 78 P.3d 600 (quotation simplified); *see also id.* ¶ 12 (stating that a contract is unenforceable "if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken" (quotation simplified)). If the parties reached agreement on the material terms of a contract but simply chose to use imprecise language to memorialize that agreement, the contract is ambiguous but enforceable once a factfinder makes a ruling, after considering extrinsic evidence, on the intended meaning of the ambiguous terms. *See Plateau Mining*, 802 P.2d at 725 ("Failure to resolve an ambiguity by determining

the parties' intent from parol evidence is error."). On the other hand, a contract, to be enforceable, must be definite enough that a court can "enforce [it] according to the parties' intentions; if those intentions are impenetrable, or never actually existed, there can be no contract to enforce." *Nielsen*, 2003 UT 37, ¶ 12; *see also* 17 C.J.S. *Contracts* § 51 (2024) (stating that a contract is enforceable "unless the promises are so indefinite that a court cannot determine what the parties intended").

¶23　Even contracts that are missing seemingly important terms are not necessarily unenforceable. *See Reed v. Alvey*, 610 P.2d 1374, 1378 (Utah 1980) ("There is no principle of equity that demands all the terms of the contract must be set forth in the written agreement."); *see also Nielsen*, 2003 UT 37, ¶ 12 ("A contract may be enforced even though some contract terms may be missing or left to be agreed upon . . . ." (quotation simplified)). In some cases, missing terms can be "supplied by law, presumption or custom," and where this is the case, the "contract will not fail for indefiniteness." *Bill Barrett Corp. v. YMC Royalty Co.*, 918 F.3d 760, 767 (10th Cir. 2019) (quotation simplified); *see also Reed*, 610 P.2d at 1378 (stating that contracts can be enforced if their "uncertainty relates to matters which the law makes certain or complete by presumption, rule or custom and usage"); *Electrical Contractors, Inc. v. Westwater Farms, LLC*, 2016 UT App 60, ¶ 11, 370 P.3d 949 (holding a contract to be enforceable despite the lack of a specific description of the services to be provided, because custom dictated that "any services that would normally be performed by a general contractor or an electrical contractor on a project such as the one at issue would be included in the contracted services"). And courts sometimes "read into" contracts a "reasonable" time provision in situations where the parties failed to specify a time frame for performance. *See, e.g.*, *Ferris v. Jennings*, 595 P.2d 857, 860 (Utah 1979).

¶24　It is sometimes said that contracts that amount to mere "agreements to agree are generally unenforceable because they leave open material terms for future consideration, and the courts cannot create these terms for the parties." *Harmon v. Greenwood*,

596 P.2d 636, 639 (Utah 1979) (quotation simplified); *see also Ohio Calculating, Inc. v. CPT Corp.*, 846 F.2d 497, 501 (8th Cir. 1988) (stating that "agreements to negotiate" are generally "deemed unenforceable because they provide neither a basis for determining the existence of a breach nor for giving an appropriate remedy"). But even a contract containing an "agreement to agree" is "not per se unenforceable," and will be enforced if it "includes sufficiently definite terms and conditions regarding the essential terms of the contract." *GeoNan Props., LLC v. Park-Ro-She, Inc.*, 2011 UT App 309, ¶ 10, 263 P.3d 1169 (quotation simplified); *see also* 25 *Williston on Contracts* § 67:4 (4th ed. 2024) (noting that "the mere fact that a contract, definite in material respects, contains some terms which are subject to further negotiation" will not prevent its enforcement).

¶25　In particular, contracts are not per se unenforceable if the parties—rather than setting forth a specific price term or a specific description of the property covered by the contract—include in the contract a method by which that term will be computed or ascertained in the future. *See Plateau Mining*, 802 P.2d at 726 ("An agreement is not unenforceable for lack of definiteness of price or amount if the parties specify a practicable method by which the amount can be determined by the court without any new expression by the parties themselves." (quotation simplified)); *see also Syme v. Symphony Group LLC*, 2018 UT App 212, ¶ 14, 437 P.3d 576 (concluding that a contract was enforceable, despite the fact that "some contract terms . . . were left to be agreed upon," because "the parties expressly contemplated that additional selections would be made, and they agreed on the process for making those selections" (quotation simplified)); *Coulter & Smith, Ltd. v. Russell* (*Coulter & Smith II*), 1999 UT App 55, ¶ 15, 976 P.2d 1218 (holding that a contract for purchase of an unspecified number of lots was enforceable, because the agreement contained "a definite method to determine the land description without further agreement by the parties: Coulter was to develop the lots according to Sandy City's annexation and zoning requirements"). In the construction industry, for example, contracts in which the parties agree to a "cost-plus" price term are not per se

unenforceable due to lack of a specific contract price, because such contracts "provide a clear method for calculating the price once the work [is] completed." *Electrical Contractors*, 2016 UT App 60, ¶ 11; *see also I-D Elec. Inc. v. Gillman*, 2017 UT App 144, ¶ 28, 402 P.3d 802 (concluding that a contract was enforceable, despite the lack of a specific price term, because the contractor's "general practice was to use a cost-plus payment system"), *cert. denied*, 412 P.3d 1255 (Utah 2018).

¶26    In the end, questions of contractual enforceability often boil down to whether the contract, construed as a whole, is merely ambiguous—a problem that can usually be resolved by resort to extrinsic evidence—or whether the contracting parties have wholly failed to reach agreement on "essential terms." *See New York Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405, 409 (10th Cir. 1996) ("If essentials are unsettled, and no method of settlement is agreed upon, there is no contract. If the writing leaves the agreement of the parties vague and indefinite as to an essential element thereof, it is not a contract and cannot be made one by parol." (quotation simplified)). In many cases, a court will not be able to conclusively determine, before examining relevant extrinsic evidence (including custom and usage), that a contract is unenforceable as a matter of law due to the absence of essential terms. *See Nielsen*, 2003 UT 37, ¶ 13. Parol evidence will often shed light on the parties' intentions, including the meaning of ambiguous terms and whether an agreement was reached at all on ostensibly missing material terms. Moreover, "whether or not [a] missing term [is] essential to the contract requires an examination of the entire agreement and the circumstances under which the agreement was entered into." *Id.* (quotation simplified); *see also* Restatement (Second) of Contracts § 131 cmt. g (Am. L. Inst. 1981) ("What is essential depends on the agreement and its context and also on the subsequent conduct of the parties, including the dispute which arises and the remedy sought."); 37 C.J.S. *Frauds, Statute of* § 131 (2024) (stating that "in a contract for sale of real estate, there is no definitive list of essential terms" because "essential terms vary[] widely according to the nature and complexity of each transaction").

B. Specific Performance

¶27 The legal principles we have described so far apply in all contract cases, regardless of whether the remedy sought is damages for breach of the contract or specific performance of the terms of the contract. But where the remedy sought is specific performance, the party seeking to enforce the contract must demonstrate a different—and in some respects higher—degree of contractual definiteness in order to succeed. *See Brown's Shoe Fit Co. v. Olch*, 955 P.2d 357, 365 (Utah Ct. App. 1998) ("We recognize that in some cases, although the terms of a contract are not certain enough to be specifically performed, the terms may be certain enough to provide the basis for calculating damages.").

¶28 Specific performance is "a court-ordered remedy that requires precise fulfillment of a legal or contractual obligation." *Specific performance*, Black's Law Dictionary (11th ed. 2019). It is "an equitable remedy that lies within the court's discretion to award whenever the common-law remedy is insufficient, either because damages would be inadequate or because the damages could not possibly be established." *Id.; see also Thatcher v. Lang*, 2020 UT App 38, ¶ 20, 462 P.3d 397 ("Specific performance is a remedy of equity and accordingly, considerable latitude of discretion is allowed in determination as to whether it shall be granted and what judgment should be entered in respect thereto . . . ." (quotation simplified)).

¶29 Because specific performance is a remedy that, by definition, involves a court ordering a party to take certain actions, a specific performance remedy is available only where "the terms of the contract are sufficiently certain to provide a basis for an appropriate order." *See* Restatement (Second) of Contracts § 362 (Am. L. Inst. 1981). The sort of certainty sufficient for specific performance is something less than absolute certainty. *See* 81A C.J.S. *Specific Performance* § 29 (2024) ("In order to warrant a decree of specific performance thereof, a contract must be clear, definite, and certain, but absolute certainty is not required."); *see also* 25 *Williston on Contracts* § 67:4 (4th ed. 2024) ("[I]t is clear that

absolute certainty regarding every aspect of the contract is not required in order that a decree of specific performance be issued . . . ."). The necessity of being able to compose a useful order of specific performance is the reason some situations might exist in which the terms of the contract are "certain enough to provide the basis for the calculation of damages but not certain enough to permit the court to frame an order of specific performance or an injunction and to determine whether the resulting performance is in accord with what has been ordered." *Brown's Shoe*, 955 P.2d at 365 n.8 (quotation simplified).

¶30 Under Utah law, a contract is sufficiently certain for specific performance if the parties have "reached agreement and committed themselves on the major aspects of the transaction," even though there might be uncertainty with regard to some of the "incidental details" of the transaction. *See Kier v. Condrack*, 478 P.2d 327, 330 (Utah 1970); *see also Reed v. Alvey*, 610 P.2d 1374, 1379 (Utah 1980) (stating that courts should "not allow" uncertainty regarding "incidental details . . . to deny specific performance"). And our supreme court has stated that the rule requiring a contract to be "sufficiently definite" before specific performance may be ordered is intended to be used "to protect a party from an injustice, and not as a weapon with which to perpetrate an injustice" or "to renege on the bargain." *Kier*, 478 P.2d at 330.

¶31 As specifically applicable here, our supreme court has also made clear that the presence of run-of-the-mill contractual ambiguity—even with regard to essential contract terms—will not operate to categorically preclude a specific performance remedy; instead, courts should deal with the presence of contractual ambiguity in specific-performance cases in more or less the same way they deal with ambiguity in damages cases. *See Reed*, 610 P.2d at 1377. On this topic, the court stated as follows:

> Before specific performance will be employed by the
> courts to enforce a contract[,] the terms of the
> agreement must be reasonably certain so the parties
> know what is required of them, and definite enough

> that the courts can delineate the intent of the contracting parties. In reviewing the written agreement evidencing the contract, and any ambiguity inherent in the language used, extrinsic evidence may be considered by the court to delineate the intent of the parties and the enforceability of the contract. Thus, courts are provided a means by which they can look beyond the terms found in the written agreement to ascertain the intent of the contracting parties. If from this examination of the transaction the courts determine the actual contract is certain and the obligation and rights of the parties defined, then they may employ their equitable powers to enforce the contract via specific performance.

*Id.* (quotation simplified). The court specifically authorized district courts, even in specific performance cases, to look not only to "extrinsic evidence" but also to things like "presumption, rule or custom and usage" in resolving "uncertainty" created by contractual ambiguity. *See id.* at 1377–78. And in a different case, the court noted that, in assessing the "definiteness" of a contract for purposes of specific performance, district courts may take into account the fact "that the parties to a contract are obliged to proceed in good faith to cooperate in performing the contract in accordance with its expressed intent." *Ferris v. Jennings*, 595 P.2d 857, 859 (Utah 1979). In that same case, the court also noted that, for contracts that omit a time-of-payment term, district courts may, where appropriate, "read into such contracts an obligation of payment within a time 'reasonable' in the context of the transaction and circumstances of the parties." *Id.* at 860.

¶32 Our supreme court has followed this procedure in several cases in which specific performance was requested and in which the contracts in question had serious ambiguities regarding material terms. For instance, in *Reed*, the contract in question was for the sale of real property located at the "corner of Hillview and

Ninth East." 610 P.2d at 1377. The contract offered no further description of the property to be sold, and the district court determined that the contract was therefore "too vague, incomplete and ambiguous to be capable of enforcement by a decree of specific performance." *Id.* Our supreme court reversed, because after examination of the extrinsic evidence unearthed by the parties, it was apparent that "everyone connected with the deal knew what land was involved." *Id.* at 1378. The court concluded that "the ambiguous nature of the terms used in the written agreement when viewed in light of the extraneous evidence presented at trial does not render the contract unenforceable or defeat an action for specific performance." *Id.*; *see also Hackford v. Snow*, 657 P.2d 1271, 1276 (Utah 1982) (determining that a contract providing for the sale of real property "described as 'Neola, (420 acre Hackford Farm), Uintah County, State of Utah'" was potentially enforceable and "sufficient to admit extrinsic evidence to aid in determining the parties' intentions," and rejecting one party's argument that the contract "did not describe the subject property with sufficient certainty as to justify specific performance"); *Jacobson v. Cox*, 202 P.2d 714, 721 (Utah 1949) (rendering a similar holding with regard to a contract for the sale of "certain leased land up in the old field, now under fence above the Spring Branch Ditch").

¶33　Enlaw contends—and the district court ruled—that specific performance is unavailable unless the contract's language is completely free of vagueness and ambiguity. In support of this proposition, Enlaw relies on language from one of our cases, a memorandum decision from 2011. *See Tooele Assocs. Ltd. P'ship v. Tooele City*, 2011 UT App 36, ¶ 2, 251 P.3d 835 (stating that "for a court to order specific performance, '[t]he contract must be free from doubt, vagueness, and ambiguity, so as to leave nothing to conjecture or to be supplied by the court'" (quoting *Pitcher v. Lauritzen*, 423 P.3d 491, 493 (Utah 1967)). However, the quoted language in *Tooele Associates*, *see id.*, comes from a Utah Supreme Court opinion that predates *Reed*, a case in which our supreme court made clear that the presence of garden-variety ambiguity is no bar to an order of specific performance, *see Reed*, 610 P.2d at

1377. Moreover, later in the same year that we issued *Tooele Associates*, we clarified that even "an agreement to agree"—a document that, by definition, contains a certain amount of ambiguity and uncertainty—could be "specifically enforced" as long as it "included sufficiently definite terms and conditions." *GeoNan Props., LLC v. Park-Ro-She, Inc.*, 2011 UT App 309, ¶ 10, 263 P.3d 1169 (quotation simplified). And even in *Tooele Associates* itself, we stated that a contract is definite enough to be specifically enforced if it is "sufficiently certain as to its terms so that the court may enforce it as actually made by the parties." 2011 UT App 36, ¶ 2 (quotation simplified).

¶34 We therefore take this opportunity to clarify that the equitable remedy of specific performance remains potentially available even if the language of the contract in question is not completely free from all doubt, vagueness, or ambiguity. Courts in specific performance cases may use the usual tools of contractual interpretation—including examination of extrinsic evidence—to try to resolve facial ambiguity. *See Reed*, 610 P.2d at 1377. And after examining the language of the contract, viewed in tandem with available extrinsic evidence and things like presumption, rule, custom, and usage, a court may order specific performance if it determines that the contract is definite enough to facilitate composition of an accurate, meaningful court order that reflects "the intent of the contracting parties," *see id.* at 1377–78, and that is "certain enough" to allow the court to "determine whether the resulting performance is in accord with what has been ordered," *see Brown's Shoe*, 955 P.2d at 365 n.8 (quotation simplified); *see also* 81A C.J.S. *Specific Performance* § 29 (2024) (stating that "absolute certainty is not required" for specific performance; that courts often look to "relevant extrinsic evidence," even in specific performance cases; and that "specific performance may be decreed even though a contract is uncertain or incomplete in some respects if the uncertainty or incompleteness relates to matters that the law makes certain or complete by presumption, rule, or custom and usage"); 25 *Williston on Contracts* § 67:4 (4th ed. 2024) (stating that specific performance does not require "absolute certainty regarding every

aspect of the contract," and that "the mere fact that a contract, definite in material respects, contains some terms which are subject to further negotiation will not bar a decree for specific performance"); 19 Am. Jur. 3d *Proof of Facts* 543 § 6 (2024) (stating that "the law favors the carrying out of contracts if a court can possibly construe the terms to ascertain the parties' intentions," and that, in order to obtain specific performance, "it is not necessary to answer every possible question about the contract" and "[i]t is sufficient if enough is known that the intent of the parties as to fundamental terms can be ascertained with reasonable certainty").

## II. Regal's Challenges to the District Court's Rulings

¶35 With these legal principles in mind, we now turn to Regal's specific challenges to the district court's rulings. First, we address Regal's assertion that the court erred in determining, as a matter of law, that the REPC's price provisions are too uncertain to enforce. Second, we address Regal's assertion that the court erred in determining that Regal had not timely tendered performance of its obligations under the REPC. And third, we address Regal's assertion that the court erred in ordering the lis pendens removed. For the reasons discussed, we find merit—at least to some extent—in all of Regal's challenges.

## A. The REPC's Price Provisions

¶36 All parties agree that Enlaw agreed to sell the Property to Regal for a total price of $4,378,500, and no party contends that there is any ambiguity in the provision setting forth the ultimate price to be paid for the Property. But Enlaw asserts—and the district court ruled—that the REPC's *price-reduction* provision in Addendum 1 is, as a matter of law, too uncertain to be enforceable at all, let alone enforced by an order of specific performance. Regal takes an entirely different position, and asserts that the price-reduction provision is, as a matter of law, entirely enforceable, even by an order of specific performance. In keeping with these positions, both sides moved for summary judgment in their favor

on the question of whether the REPC's price provisions, construed together, were sufficiently definite to be enforced by an order of specific performance, and the district court granted Enlaw's motion and denied Regal's. In our view, neither of the summary judgment motions should have been granted on this point at this stage of the proceedings, because the REPC's price provisions are facially ambiguous and are at least potentially definite enough to be enforceable, depending on the extent to which Regal's disputed assertions about the parties' intentions are found to be supported by the still-developing factual record.

¶37 We agree with Enlaw about this much: some of the language of the price-reduction provision is facially ambiguous and therefore potentially uncertain in its meaning. In the first sentence of the price-reduction provision, the parties agreed that Regal would obtain bids "for the installation of the road and other improvements including utilities required by local government, utility companies, and other services agencies (Santa Clara City, etc.) to the Property line at the locations and capacities determined by the engineer and the city approved plan." This language contains several potential ambiguities. For instance, nowhere in the REPC is the identity of "the road" ever specified. But the parties are apparently in agreement that this failure to describe the actual stretch of road Regal was agreeing to construct does not render the REPC unenforceable; indeed, both sides now acknowledge that the parties' original intent—although not stated expressly in the REPC—is that Regal would be responsible for the construction of part of "Red Mountain Drive." *See generally, e.g.*, *Reed v. Alvey*, 610 P.2d 1374, 1378 (Utah 1980) (holding that facial ambiguity regarding the description of the real property subject to the contract does not preclude specific performance of a contract where extrinsic evidence revealed that "everyone connected with the deal knew what land was involved").

¶38 But while any ambiguity regarding the identity of "the road" has apparently been taken care of, Enlaw maintains that uncertainty remains regarding the "other improvements" that Regal agreed to construct along with the road. Regal responds by

acknowledging that the REPC does not specify which "other improvements" are to be built along with the road, but it asserts that the REPC does provide a method by which those improvements will later be identified. The language of the price-reduction provision states that the "improvements" in question are the ones that will be "required by local government, utility companies, and other services agencies . . . at the locations and capacities determined by the engineer and the city approved plan." As Regal sees it, the City and other governing entities will dictate—by setting forth specifications that will eventually be included in engineering plans and an approved plat—how the road is to be built, including the "improvements" they require to be built along with it. And Regal asserts that this is exactly what the parties agreed to: Regal would be responsible for building the road, including "other improvements," to specifications dictated to it by regulating entities. We agree with Regal that such an agreement—assuming that this *was* the parties' agreement, a point on which the district court has not yet rendered any factual finding—is not too vague or uncertain to enforce, because it includes a definite method by which the identity of the "improvements" will eventually be ascertained, without the necessity of further negotiation between the parties. *See Coulter & Smith II*, 1999 UT App 55, ¶ 15, 976 P.2d 1218 (holding that a contract for purchase of an unspecified number of lots was enforceable, because the agreement contained "a definite method to determine the land description without further agreement by the parties: Coulter was to develop the lots according to Sandy City's annexation and zoning requirements").

¶39    Enlaw also perceives fatal uncertainty in the final sentence of the price-reduction provision. In that sentence, the parties agreed that "[t]he selection of contractor, the bid amount and the reduction in Purchase Price will be mutually agreed upon by both Buyer and Seller prior to the end of the due diligence period." As Enlaw sees it, this language is a quintessential agreement to agree because, in Enlaw's interpretation, it requires further negotiation and requires the parties to "mutually agree[]" on the "reduction in Purchase Price." Enlaw analogizes to our opinion in *Bloom*

*Master Inc. v. Bloom Master LLC*, in which we held unenforceable a contract in which the parties did not agree to any actual terms for repayment of a loan, but instead agreed that repayment would be "dependent upon the continued success of the [planter product]" and therefore "the principal amount, rates of interest, maturity date and other terms and conditions [would] be reviewed on an annual basis." 2019 UT App 63, ¶ 4, 442 P.3d 1178. We concluded that the contract in question was an unenforceable "agreement to agree because it anticipates some future agreement regarding modification of myriad contractual terms and because there is no clear mechanism for determining the modification." *Id.* ¶ 20.

¶40  Regal, on the other hand, resists Enlaw's contention that any further negotiation is required here. Regal points out that the parties clearly agreed that the reduction in purchase price will be "the cost to complete" the road and the "other improvements," and it asserts that there exists a clear mechanism for determining the amount of that reduction: Regal will obtain construction bids, using the specifications provided to it in a plat approved by the regulating entities, and the parties must then simply review those bids and select one. As Regal sees it, once a bid is chosen, the rest will fall into place in cascading fashion: "when a bid is accepted one thereby chooses the contractor, and the amount of the bid is the reduction in the purchase price." Regal thus analogizes to cases in which parties agreed, in a contract, to allow a later-selected third party to determine a material term of the contract, such as the purchase price of property after an appraisal. *See Turley v. Childs*, 2022 UT App 85, ¶¶ 38–39, 515 P.3d 942 (determining that a contract was enforceable even though it left the purchase price to be determined by a "third appraiser" who would be appointed by two other appraisers, one chosen by each side); *see also Coulter & Smith II*, 1999 UT App 55, ¶ 15. And it argues that, for instance, arbitration clauses are not unenforceable simply because the parties agree to select an arbitrator later, at the time a dispute arises.

¶41  In our view, Regal has the better of this argument. The REPC contains a clear agreed-upon methodology for ascertaining

the amount of the purchase price reduction, and nothing about this process renders the REPC too uncertain to be enforceable. This case is therefore much more like *Turley* and *Coulter & Smith II* than it is like *Bloom Master*, where the parties had completely failed to identify any process—other than future negotiation—to arrive at the loan repayment terms.

¶42    To be sure, future complications could conceivably arise with the execution of the agreed-upon methodology. Enlaw wonders what might happen if it does not wish to use any of the contractors from whom Regal solicits bids, or if the parties cannot agree on a contractor. These are contingencies that certainly have not happened yet, and in our view are unlikely to happen; if they *do* happen, the parties can then revisit questions of enforceability or other contractual defenses (such as impossibility). We agree with Regal that the mere possibility of such contingencies arising in the future does not render the REPC unenforceable from the outset. And we note that the parties will each be obligated, by the covenant of good faith and fair dealing implied by force of law into every contract, "to proceed in good faith to cooperate in performing the contract in accordance with its expressed intent." *See Ferris v. Jennings*, 595 P.2d 857, 859 (Utah 1979); *see also Young Living Essential Oils, LC v. Marin*, 2011 UT 64, ¶ 8, 266 P.3d 814 (stating that "the parties to a contract cannot feasibly anticipate all possible contingencies nor reasonably resolve how they would address them in writing," and that the implied covenant has a role to play in filling such gaps).

¶43    Finally, we reject Enlaw's assertion that the possibility of selection of a "cost-plus" bid—or the possibility of post-closing change-order amendments to a fixed-price bid—renders the REPC too indefinite to enforce as a matter of law. As Enlaw sees it, the REPC requires that the "reduction in Purchase Price . . . be mutually agreed upon . . . *prior to the end of the due diligence period*." (Emphasis added.) And it asserts that, if a "cost-plus" bid is selected for construction of the road, or if change-order amendments are made to a fixed-price bid after closing, the parties will not know the exact amount of the price reduction at

closing and, instead, will have to wait until completion of construction for that amount to finally be ascertained. This argument is unpersuasive, at least at this stage of the litigation.

¶44    It is quite probable—and not inconsistent with the language of the REPC—that the parties intended for there to be some sort of true-up accounting to be had following completion of the road construction and that they did not intend for ordinary construction-contract uncertainty about final price to be an obstacle to enforceability. After all, regardless of whether a cost-plus or a fixed-price bid is chosen, it is very likely that the eventual cost of construction will not match, to the penny, the price of the original bid. In light of this reality, post-construction true-ups are quite common in the construction industry; they occur in every cost-plus situation and in many fixed-price situations. 2A *Bruner & O'Connor on Construction Law* § 6:98 (2023) (noting that with a "fixed price contract" a contractor "receives one fixed price for performing the work," but this is still typically "subject to certain possible price adjustments for changed conditions, or changes or delays imposed by the owner"). Indeed, Regal asserts that such adjustments are not at odds with the potentially ambiguous language of the REPC, which stipulates that the purchase price reduction will be "the cost to complete" the road construction, but which also contemplates a bid-approval process to arrive at that exact amount. As Regal sees it, what must be "mutually agreed upon . . . prior to the end of the due diligence period" isn't necessarily an exact dollar amount but, rather, selection of a bid, which—regardless of whether it is a cost-plus bid or a fixed-price bid—will have a specific built-in procedure for accounting for post-closing adjustments in bid price. Regal also points out that, under the REPC, it is obligated to pay exactly $4,378,500 one way or the other, with part of that sum going to Enlaw for the Property and part going to the contractor eventually selected for the road construction; it asserts that, in an attempt to provide for post-closing adjustments, some amount of money could be placed in an escrow account at closing, with the distribution of those funds to be made later after the total construction price is finalized.

¶45    Regal's interpretation of the REPC—to potentially allow post-closing adjustments to the total construction cost—is a reasonable one and should not have been foreclosed on summary judgment before completion of discovery and before findings have been made regarding the parties' intent. The concerns raised by Enlaw about post-closing adjustments are therefore not a basis—at least not at this procedural stage—for a determination that the REPC is too uncertain to be enforced.

¶46    For all of these reasons, we conclude that the district court's ruling—made as a matter of law on summary judgment before the completion of fact discovery—that the REPC is too vague and uncertain to specifically enforce was erroneous. Regal advances a reasonable interpretation that, if eventually supported by extrinsic evidence, could lead to enforcement of the price provisions of the REPC. We therefore agree with Regal that the district court erred by granting Enlaw's motion for summary judgment regarding enforceability of the REPC's price provisions, and we reverse that determination. But given the procedural stage this case was in when the summary judgment motions were filed, we stop short of concluding that Regal is entitled to summary judgment in its favor, and we therefore affirm the court's denial of Regal's summary judgment motion on this point.[3]

---

3. On appeal, Regal also argued that we could sever the price-reduction provision from the rest of the REPC, an action it contends would obviate any questions of uncertainty and ambiguity. *See generally Sosa v. Paulos*, 924 P.2d 357, 363 (Utah 1996) ("In Utah, contract provisions are severable if the parties intended severance at the time they entered into the contract and if the primary purpose of the contract could still be accomplished following severance."). In response, Enlaw asserts that Regal did not preserve a severability argument in the district court. Because we conclude that the court erred in determining, as a matter of law, that the REPC was unenforceable, we need not reach the severability issue. Nothing in this opinion prevents the parties from further exploring severability issues on remand.

### B. The REPC's Closing Deadline

¶47 Second, Regal challenges the district court's determination—made in its ruling on Enlaw's motion to remove the lis pendens—that Regal had not timely tendered performance of its obligations under the REPC. In this vein, Regal also takes issue with the court's denial of the final two requests for relief made in its own motion for partial summary judgment, in which it asked the court to conclude, as a matter of law based on the REPC's plain language, that the term "Entitlements" as used in Addendum 2 refers to approval of Regal's specific project for the Property and not to approval of Enlaw's overarching MDA, and that Regal has not yet received the contemplated Entitlements. We largely agree with Regal.

¶48 First, we agree with Regal that—as a matter of plain language—the term "Entitlements" as used in Addendum 2 refers to approval of Regal's specific project and not to the MDA. In Addendum 2, the parties defined "Buyer" as Regal and "Seller" as Enlaw. The parties then agreed to extend the REPC's "Seller Disclosure Deadline Date" to the "date on which [the City] gives final approval of *Buyer's* development project including, without limitation, an executed development agreement for the Property (the 'Entitlements')." (Emphasis added.) We need not proceed beyond the plain language of the REPC in order to conclude that this provision—and the term "Entitlements"—unambiguously refers to approval of *Regal's* smaller "development project" on the Property and not to Enlaw's larger, overarching Black Desert MDA. *See Ocean 18 LLC v. Overage Refund Specialists LLC (In re Excess Proceeds from Foreclosure of 1107 Snowberry St.)*, 2020 UT App 54, ¶¶ 21–22, 474 P.3d 481 (stating that contractual interpretation begins with examination of the contract's plain language, and that if the plain language of the contract is clear and unambiguous, then "the contract may be interpreted as a matter of law, without resort to parol evidence" (quotation simplified)).

¶49 To be sure, the Property is part of what is covered in the MDA; that document even contains provisions specifically aimed

at the Property. But we reject Enlaw's assertion that Addendum 2 refers to the MDA. As an initial matter, the MDA is aimed at obtaining approval for the larger Black Desert project, not Regal's smaller project on the Property, and Addendum 2 clearly references approval of Regal's development project. It would strain the language beyond recognition to construe "approval of *Buyer's* development project" to mean approval of Enlaw's MDA. (Emphasis added.) If the parties had intended for the deadline in Addendum 2 to be triggered by approval of the MDA, they could have chosen language indicating that the deadline was triggered by the City's approval of "Enlaw's" or "Seller's" development project. But they didn't.

¶50   Moreover, the MDA did not afford Regal "*final* approval" for any particular project on the Property. (Emphasis added.) Instead, it merely stated that the Property is "designated for medium density residential" and could potentially "be developed to a density of eight (8) dwelling units per acre, for a total of approximately 133 units." It allowed for the possibility that a project built there might contain additional density, authorizing developers to "seek approval of a density bonus of up to fifty percent . . . for a maximum of approximately two hundred (200) dwelling units," with approval of any such "bonus" being "subject to the conditions set forth in" the City's ordinances. Thus, even if by some stretch the words "Buyer's development project" could refer to the entire Black Desert project, the MDA in any event did not give final approval for any specific "development project" on the Property. Thus, we conclude—as a matter of law— that Addendum 2 refers to eventual "final approval" of Regal's specific project, and not to the MDA.

¶51   Because Addendum 2's closing deadline is unambiguously triggered only by "final approval" of "Buyer's development project," that deadline was therefore *not* triggered by the City's September 2021 approval of the MDA. Accordingly, it follows that the district court erred by concluding that, merely because Regal failed to close within 45 days of the City's approval of the MDA, "Regal failed to timely close on the Property."

¶52 Enlaw resists this conclusion by making two arguments, neither of which is persuasive. First, it argues that Addendum 2 fails for lack of consideration, asserting that Enlaw gave no consideration for agreeing to extend the REPC's closing deadline. "Under contract law, courts will not ordinarily inquire into the adequacy of consideration unless it is so insufficient or illusory as to render enforcement of the contract unconscionable." *JENCO LC v. SJI LLC*, 2023 UT App 151, ¶ 43, 541 P.3d 321 (quotation simplified). Here, Addendum 2 was supported by sufficient consideration. By agreeing to extend the deadline, Enlaw was—at least temporarily—able to satisfy Regal's complaints about Enlaw's delays in obtaining the MDA, and it meant that Enlaw did not have to seek out another party willing to purchase the Property that was also willing to develop the road. Furthermore, the REPC originally provided that Regal would have "60 calendar days" after the trigger date (then, the conclusion of the due diligence period) to close on the Property, but Addendum 2—to Enlaw's benefit—shortened that to "45 days" from the new trigger date (receipt of the Entitlements). We therefore conclude that Addendum 2 is supported by adequate consideration, and that the district court was incorrect to suggest otherwise.

¶53 Second, Enlaw asserts that Regal's interpretation of Addendum 2—that the closing deadline is 45 days after eventual approval of its own development project on the Property—runs afoul of the rule against perpetuities.[4] That rule exists "to insure

---

4. On appeal, the parties each referenced the common-law rule against perpetuities. But our legislature has codified the rule against perpetuities, *see* Utah Code § 75-2-1203(1), and in so doing it made clear that the old common-law version of the rule no longer applies, *id.* § 75-2-1208 ("The common law rule against perpetuities does not apply in this state."). The main difference between the statutory version and the common-law version is the length of time that must elapse before a property interest is deemed invalid. Under the common-law version, the relevant time period was "twenty-one years after some life in being at the

(continued…)

that property is reasonably available for development by forbidding restraints that keep property from being used for a lengthy period of time." 70 C.J.S. *Perpetuities* § 11 (2024); *see also Coulter & Smith, Ltd. v. Russell* (*Coulter & Smith I*), 966 P.2d 852, 856 (Utah 1998). To that end, the rule states that "[a] nonvested property interest is invalid unless within 1,000 years after the interest's creation the interest vests or terminates." Utah Code § 75-2-1203(1). In essence, Enlaw asserts that, under Regal's interpretation of the REPC, the closing deadline is triggered by an eventuality—approval of Regal's specific project—which might never come, and it argues that this interpretation could cause the Property to remain in limbo for a very long time after execution of the REPC, thus violating the rule against perpetuities.

¶54 But this problem is averted rather easily by implication of a "reasonable time" provision into Addendum 2, an action courts routinely take in cases where "a contract fails to specify a time of performance." *Coulter & Smith I*, 966 P.2d at 858; *see also Holt v. Holt*, 2024 UT App 6, ¶ 20, 543 P.3d 214 ("Our principles of contract interpretation . . . provide that if a contract fails to specify a time of performance the law implies that it shall be done within a reasonable time under the circumstances . . . ." (quotation simplified)). Indeed, "a contract should first be interpreted by utilizing the ordinary rules of contract construction before applying the rule against perpetuities." *Coulter & Smith I*, 966 P.2d at 857. In this case, the 45-day closing deadline will be triggered by "final approval" of Regal's "development project," an eventuality that must occur within a reasonable time. What

---

creation of the interest." *Coulter & Smith, Ltd. v. Russell* (*Coulter & Smith I*), 966 P.2d 852, 856 (Utah 1998). Under the statutory version, the relevant time period is "1,000 years after the interest's creation." Utah Code § 75-2-1203(1). Our conclusion—that implication of a "reasonable time" provision into Addendum 2 almost certainly renders the rule against perpetuities irrelevant—is the same regardless of which version of the rule applies here. Accordingly, in our analysis we reference the codified version of the rule, which was in effect at all relevant times.

constitutes a reasonable time under the circumstances is a question of fact. *See New York Ave. LLC v. Harrison*, 2016 UT App 240, ¶ 35, 391 P.3d 268 ("What constitutes a reasonable time is necessarily a fact-intensive question that depends upon the subject-matter, the nature of the act to be performed, and the situation of the parties . . . ." (quotation simplified)), *cert. denied*, 393 P.3d 283 (Utah 2017). So, unless a factfinder later determines that a "reasonable time" in this situation is something longer than one thousand years from the time the REPC was executed, the REPC does not run afoul of the rule against perpetuities.

¶55 Finally, we note the limitations of our holding in this section of our opinion. We conclude, as a matter of law, that Addendum 2's closing deadline is unambiguously triggered only by "final approval" of "Buyer's development project," and that the deadline was therefore *not* triggered by the City's September 2021 approval of the MDA. We therefore reverse the district court's determination—made in its lis pendens ruling—that, merely because Regal failed to close on the transaction within 45 days of the City's approval of the MDA, "Regal failed to timely close on the Property." We therefore also reverse, in part, the court's denial of Regal's motion for partial summary judgment, and we grant Regal part of the relief it sought in that motion, namely, that the term "Entitlements," as used in Addendum 2, refers to "final approval" of *Regal's* "development project" and does not refer to the MDA.

¶56 But we stop short of ordering reversal of the district court's denial of Regal's request, on summary judgment, for a declaration that Regal's receipt of the "Entitlements," as that term is used in Addendum 2, has not yet occurred. While there are no ambiguities in Addendum 2 with regard to *whose* project's approval triggers the 45-day closing deadline, the district court correctly perceived ambiguities in Addendum 2 with regard to exactly what documents must be approved by the City in order to trigger that deadline. Addendum 2 indicates that "final approval" of Regal's project might "includ[e] . . . an executed development agreement for the Property," but Addendum 1 indicates that

Regal will also be seeking approval of a "recordable plat." In our view, the REPC is not entirely clear as to exactly what document or documents need to be approved by the City in order to trigger the 45-day closing deadline. Because further fact questions remain to be decided on this point in order to clear up this ambiguity, we are unable to ascertain, as a matter of law, whether that deadline has or has not yet expired, and on that basis we affirm the district court's denial, at this procedural stage, of Regal's third request for relief in its motion for partial summary judgment.

## C. The Lis Pendens Ruling

¶57    Finally, Regal challenges the follow-on ruling that, because the REPC was unenforceable as a matter of law, the lis pendens Regal recorded against the Property was improper and should be removed. Regal asserts that the district court's lis pendens ruling was simply a function of its summary judgment ruling regarding enforceability, and it posits that, if that ruling is vacated, then the lis pendens ruling must also be vacated. We agree.

¶58    On a basic level, a lis pendens is a "notice, recorded in the chain of title to real property," that "warn[s] all persons that certain property is the subject matter of litigation, and that any interests acquired during the pendency of the suit are subject to its outcome." *Lis pendens*, Black's Law Dictionary (11th ed. 2019). Under Utah law, when an action has been filed that "affects the title to, or the right of possession of, real property," any of the involved parties "may file a notice of pendency of action." Utah Code § 78B-6-1303(1)(a). That notice will be ordered released if a court determines that the party who filed it is unable to establish "the validity of the real property claim that is the subject of the notice." *Id.* § 78B-6-1304(2)(b). It made sense, then, for the district court to order the lis pendens removed once it had ruled that the REPC was unenforceable and that Regal would therefore be unable to obtain title to or possession of the Property.

¶59    But we have now reversed the court's ruling that Regal's specific performance claim is invalid and have thereby

reinvigorated that claim, which is a cause of action that unquestionably implicates "title to" the Property. *See id.* § 78B-6-1303(1)(a). Accordingly, there is once again a valid basis for Regal to maintain a lis pendens against the Property, and therefore no current legal basis upon which a court can order the lis pendens removed. In summary, as long as Regal's specific performance claim remains alive, Regal has the right to have the notice of lis pendens kept on record. We therefore reverse the district court's order commanding Regal to remove the lis pendens.[5]

CONCLUSION

¶60   The district court correctly denied part of Regal's motion for partial summary judgment, because fact questions regarding the intent of the parties remain to be litigated and determined with regard to interpretation of the REPC's price reduction provision and with regard to which documents, exactly, must be approved in order to trigger Addendum 2's 45-day closing deadline. To that extent, we affirm the rulings of the district court.

¶61   But the district court erred by declaring, as a matter of law at this stage of the litigation, that the REPC's price provisions are

---

5. Regal argues that our reversal of some of the district court's rulings entitles it to attorney fees under the REPC, which provides that "[i]n any action arising out of this Contract, the prevailing party shall be entitled to costs and reasonable attorney's fees." This request is premature. At this time, we have no basis for awarding attorney fees or for providing instruction that attorney fees should be awarded. Whether any party will be entitled to attorney fees is a matter for the district court to determine, in the first instance, when this litigation is concluded. *Crank v. Utah Jud. Council*, 2001 UT 8, ¶ 44 n.18, 20 P.3d 307 ("The question of entitlement to fees at the trial court level has not yet been determined. Thus, any appropriate award of attorney fees on appeal is dependent upon that determination and should be assessed by the district court on remand.").

too vague and indefinite to support an order of specific performance. The court also erred by determining that Addendum 2's closing deadline had been triggered by the City's approval of Enlaw's MDA; we hold, as a matter of law, that it had not. Based on these conclusions, we reverse the district court's grant of Enlaw's motion for partial summary judgment, and thereby reinstate, pending further litigation, Regal's claim for specific performance of the REPC. We also reverse the court's denial of Regal's motion for partial summary judgment, as concerns its second request for relief—its assertion that the 45-day closing deadline was not triggered by the City's approval of the MDA—and we remand this matter with instructions to grant Regal's motion in this particular respect. Furthermore, and also based on these conclusions, we reverse the court's decision to order Regal to release the lis pendens.

¶62    We therefore remand the case to the district court for further proceedings, consistent with this opinion, aimed at resolving the remaining ambiguities in the REPC according to the parties' original contracting intentions.

———————